[Cite as *State v. Fields*, 2014-Ohio-5386.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

| STATE OF OHIO | C.A. No.    13CA010453 |
|---|---|
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| ANTONIO M. FIELDS | COURT OF COMMON PLEAS COUNTY OF LORAIN, OHIO |
| Appellant | CASE No.    10CR081864 |

DECISION AND JOURNAL ENTRY

Dated: December 8, 2014

HENSAL, Judge.

{¶1}   Appellant, Antonio M. Fields, appeals his convictions in the Lorain County Court of Common Pleas. For the following reasons, this Court affirms in part and reverses in part.

I.

{¶2}   On November 20, 2010, Mr. Fields and his girlfriend, Tracey K., were involved in an argument at her home after she ended their relationship. According to Tracey, Mr. Fields left her home and returned several hours later. Upon his return, he resumed arguing with her and hit her in the face as she was lying down with her four-year-old son, M.N., in the downstairs living room. Tracey yelled for the assistance of her sister, Wanda M., who was upstairs in a bedroom with another sister, Shelli K., and several children. Mr. Fields continued to hit Tracey so hard that she urinated. He also bit her on the back of her neck. According to Wanda, after she and Shelli came to their sister's aid, both she and Mr. Fields went into the kitchen where he hit her in the face causing her to fall to the ground and injure her elbow.

{¶3} Mr. Fields, Tracey, M.N., Wanda, and Shelli proceeded upstairs. According to Shelli, she went to an upstairs bedroom with Tracey and M.N. prior to Mr. Fields and Wanda coming upstairs. Wanda testified that she was behind Mr. Fields as he went upstairs. Wanda's two daughters, six-year-old A.K. and eight-year-old O.K., were in the bedroom closet crying and trying to hide. Shelli held her two-month-old niece, J.K., in her arms. After all the individuals were in the bedroom, Mr. Fields told them that this was a "hostage situation" and threatened to shoot all of them except the infant. He indicated to the eight-year-old that she would be the first one shot. Mr. Fields demanded any personal property that the victims had, including their debit cards and accompanying access codes, money, and cell phones. He next proceeded to hit both Shelli and Tracey. As he punched Shelli in the head, he struck the infant in the head with his forearm. After Tracey took the baby from her, Mr. Fields continued to punch Shelli in the head. Tracey's four-year-old son was also struck in the face when Mr. Fields swung at his mother from across the bed.

{¶4} With all of the victims in the room, Mr. Fields placed two phone calls. In one call, he asked for a "hammer and seven burners," which is slang for a gun and seven bullets. In another call, he invited men to come over to the house to have sex with the victims for money since the women had no money to give him. Mr. Fields went back downstairs several times, which gave the victims an opportunity to place several 911 calls on a cell phone Wanda hid from him under the infant's carrier. The victims reported that they could hear glass breaking and things thrown around the house after he went downstairs.

{¶5} When the police arrived, Mr. Fields held the bedroom door closed. He told the responding officers that they would need to shoot their way in and that there were women and children in the room. With the assistance of another officer, Officer Erick Gonzalez was able to

open the door wide enough to fire his taser at Mr. Fields. The officers eventually gained entry to the bedroom where they wrestled with Mr. Fields. Officer Gonzalez sustained a laceration to his lower right leg when he struck a dresser while attempting to subdue him.

**{¶6}** Mr. Fields was indicted by the Grand Jury on 18 counts, which included kidnapping under Revised Code Sections 2905.01(A)(2) and (B)(2), aggravated robbery, aggravated burglary, assault, and obstructing official business. The kidnapping, aggravated robbery, and aggravated burglary charges all included repeat violent offender specifications. After Mr. Fields pleaded not guilty to the charges, the case proceeded to a jury trial. The trial on the repeat violent offender specifications was bifurcated from the trial on the rest of the charges at Mr. Fields' request. At the State's request, an additional instruction on attempted aggravated robbery was included. The jury convicted him of all the offenses except one count of kidnapping the infant. After the jury was discharged, the trial court noticed that a juror failed to sign the verdict form that convicted him on one of the kidnapping counts. The trial court declared a mistrial on that count as a result. After a hearing, it also convicted him of the attendant repeat offender specifications. At sentencing, the court merged the kidnapping convictions under Section 2905.01(A)(2) with the kidnapping convictions under subsection (B)(2), the aggravated robbery and aggravated burglary convictions with three of the kidnapping convictions under Section 2905.01(B)(2), and the obstructing official business convictions with the assault convictions. It sentenced Mr. Fields to an aggregate term of 30 years in prison with each individual sentence to run consecutively. He appeals raising four assignments of error for this Court's review.

II.

ASSIGNMENT OF ERROR I

THE VERDICTS FOR KIDNAPPING AS THE CRIMES WERE DEFINED BY THE COURT, IN COUNTS ONE, TWO, FIVE, SIX[,] AND SEVEN AND AGGRAVATED ROBBERY, AS DELINEATED IN COUNT FIFTEEN, WERE AGAINST THE WEIGHT OF THE EVIDENCE.

{¶7} Mr. Fields argues in his first assignment of error that his convictions for kidnapping under Section 2905.01(A)(2), aggravated robbery, and aggravated burglary were against the manifest weight of the evidence.[1] We agree only to the extent that his aggravated robbery conviction was not supported by sufficient evidence.

**Aggravated Robbery**

{¶8} Mr. Fields argues that his conviction for aggravated robbery was against the manifest weight of the evidence because there is no evidence he possessed a deadly weapon during the incident. While his argument is couched in terms of challenging the manifest weight of the evidence, the substance of his argument suggests that the State did not produce sufficient evidence of aggravated robbery. As such, this Court will analyze his argument using the sufficiency standard. *See B.C. v. A.S.*, 9th Dist. Medina No. 13CA0020-M, 2014-Ohio-1326, ¶ 4.

{¶9} "Whether the evidence is legally sufficient to sustain a verdict is a question of law" that this Court reviews de novo. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind

---

[1] While Mr. Fields' assignment of error does not mention that his conviction for aggravated burglary was against the manifest weight of the evidence, the substance of his argument also challenges that conviction. Accordingly, this Court will address his argument concerning whether his aggravated burglary conviction was against the manifest weight of the evidence.

of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. The test for sufficiency requires a determination of whether the State has met its burden of production at trial. *Thompkins* at 390 (Cook, J., concurring).

{¶10} Mr. Fields was charged with aggravated robbery under Revised Code Section 2911.01(A)(1). This Section provides that "[n]o person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, * * * shall * * * [h]ave a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it[.]"

{¶11} Tracey testified that she initially thought Mr. Fields had a gun because he kept his hands in the front of his pants under his shirt. According to Tracey, he did not specifically say anything to indicate that he had a gun other than stating that the eight-year-old would be the first to die and that the victims were going to make money for him.

{¶12} Shelli testified that she also thought Mr. Fields had a gun because of the way he kept his hand in his pants and by his actions in the bedroom. She acknowledged that he did not, in fact, have a gun. Shelli further testified that Mr. Fields told them a gun was on its way and that he would shoot them. According to her, when the police arrived and attempted to gain entry into the bedroom, the victims yelled to the police that Mr. Fields did not have a gun despite his statements to the officers that they would need to shoot their way in.

{¶13} Wanda also testified that she initially believed Mr. Fields possessed a gun by the way he placed his hand down the inside of his pants. She also inferred he had a gun from the way he paced around the bedroom telling them they were going to die.

{¶14} Officer Gonzalez testified that, as he arrived on the scene, he heard a woman screaming from the second floor window that, "[h]e's killing us. * * * He has a gun * * *." He reported that Mr. Fields told the officers they would have to shoot their way into the bedroom and repeatedly attempted to provoke the officers into firing their weapons. Officer Gonzalez acknowledged that, as he patted Mr. Fields down after placing him in custody, he did not discover a weapon.

{¶15} The State argues that this Court should affirm Mr. Fields' aggravated robbery conviction because a jury could infer from the witnesses' testimony that he possessed a deadly weapon. The State is correct that, ordinarily, the jury may reasonably infer from the evidence that the defendant possessed a gun during the robbery even if the weapon is never located. *See State v. Vondenberg*, 61 Ohio St.2d 285 (1980), syllabus; *State v. Burns*, 9th Dist. Summit No. 26332, 2013-Ohio-4784, ¶ 11, 17; *State v. Haskins*, 6th Dist. Erie No. E-01-016, 2003-Ohio-70, ¶ 41-42.

{¶16} This case is unique, however, because there is no dispute that Mr. Fields did not possess a gun at any time during the incident. Tracey, Shelli, and Wanda all testified that, while they initially believed Mr. Fields had a gun based on the way he positioned his hands and made threats that he was going to shoot them, it became clear that he did not have a gun after all when he placed a call for a "hammer and seven burners." Further, none of the victims testified that Mr. Fields explicitly told them he had a gun at the time.

{¶17} All of the evidence introduced at trial conclusively indicated that Mr. Fields did not possess a gun or other deadly weapon during the incident. Although they testified that he indicated that he possessed a gun, he did not, in fact, have a gun. *See* R.C. 2911.01(A)(1). This is not a case where the investigating officers failed to locate a weapon after the crime due to the

passage of time or where a defendant fled and secreted the weapon. *See Haskins* at ¶ 42. Rather, all of the evidence produced at trial, including the victims' and Officer Gonzalez's testimony, points to the fact that Mr. Fields did not have a gun during the incident. We are not persuaded by the State's argument that the victims' initial belief that Mr. Fields had a gun is sufficient to justify his conviction when there is no evidence that he actually possessed a gun and there is evidence that he did not possess a gun. Under the particular facts of this case, and after reviewing the evidence in a light most favorable to the State, we conclude that no rational trier of fact could have found that Mr. Fields had a deadly weapon on or about his person or under his control. Accordingly, the State failed to set forth sufficient evidence on an essential element of aggravated robbery that was necessary to sustain his aggravated robbery conviction. *See* R.C. 2911.01(A)(1).

**Aggravated Burglary**

{¶18} Mr. Fields next argues that his conviction for aggravated burglary is against the manifest weight of the evidence because he did not trespass in the home with the purpose of committing a criminal offense. He further argues that any theft offenses were incidental to and done for the purpose of keeping his victims restrained.

{¶19} To determine whether Mr. Fields' conviction was against the manifest weight of the evidence, this court

> must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). Weight of the evidence pertains to the greater amount of credible evidence produced in a trial to support one side over the other side. *Thompkins*, 78 Ohio St.3d at 387. The appellate court should only exercise its power to reverse a

judgment as against the manifest weight of the evidence in exceptional cases. *State v. Carson*, 9th Dist. Summit No. 26900, 2013-Ohio-5785, ¶ 32, citing *Otten* at 340.

{¶20} Mr. Fields was convicted of aggravated burglary under Revised Code Section 2911.11(A)(1). This section provides that

> [n]o person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if * * * [t]he offender inflicts, or attempts or threatens to inflict physical harm on another[.]

A criminal trespass occurs when one, "without privilege to do so, * * * [k]nowingly enter[s] or remain[s] on the land or premises of another[.]" R.C. 2911.21(A)(2). "Privilege" is defined as "an immunity, license, or right conferred by law, bestowed by express or implied grant, arising out of status, position, office, or relationship, or growing out of necessity." R.C. 2901.01(A)(12). "The privilege to enter or remain on the land or premises may be revoked." *State v. Hartman*, 9th Dist. Medina No. 12CA0057-M, 2013-Ohio-4407, ¶ 28.

{¶21} Wanda testified that she rented the home where the incident occurred. Her two children and grandchild, along with Tracey and her children, lived at the home. According to Wanda, because Mr. Fields was a family friend, he was permitted to arrive and leave whenever he wanted. She did, however, ask him to leave numerous times once the altercation escalated.

{¶22} Tracey testified that, during the relationship, Mr. Fields was welcome to come to the home. She acknowledged that, even after their argument earlier in the day wherein he left the home, he was permitted to come back as she never expressly told him he was not welcome to return. Tracey admitted that Mr. Fields did not force his way into the home when he returned that evening. Shelli corroborated both Wanda's and Tracey's testimony that they told him to leave more than once.

{¶23} The victims' testimony established that both Wanda and Tracey repeatedly asked Mr. Fields to leave the home as his behavior escalated. There was no evidence that he either complied or attempted to comply with their requests to leave the premises. Accordingly, this Court concludes that the jury could reasonably infer that Mr. Fields' privilege to remain on the premises was effectively revoked and that he remained on the premises despite the revocation of his privilege to be there. *See State v. Campbell*, 9th Dist. Summit No. 24668, 2010-Ohio-2573, ¶ 19.

{¶24} Mr. Fields further argues that he did not restrain the victims for the purpose of committing a criminal theft. Rather, he maintains, that the alleged theft occurred as a means to facilitate the victims' restraint as he continued his argument with Tracey.

{¶25} The victims' testimony, however, belies Mr. Fields' argument that he stole their personal property as a means to keep them restrained rather than for the purposes for committing a theft. Tracey testified that Mr. Fields told them that this was a "hostage situation" and that "he was going to get his money * * *." She reported that he also took the victims' debit cards and personal identification numbers in addition to their cell phones.

{¶26} Shelli testified that Mr. Fields demanded that the victims pull down their pants and open up their shirts to make sure they did not hide anything from him. She reported that he "called for some guys to come, he was going to make us have sex with them because we had no money to give him." According to Shelli, Mr. Fields was demanding that the victims give him money throughout the ordeal. He also requested their food cards and "anything that anybody had."

{¶27} Mr. Fields' purpose in restraining the victims was a matter of the witnesses' credibility that was within the jury's province. *State v. DeHass*, 10 Ohio St.2d 230 (1967),

paragraph one of the syllabus. "A conviction is not against the manifest weight [of the evidence] because the jury chose to credit the State's version of the events." *State v. Glunt*, 9th Dist. Medina No. 13CA0050-M, 2014-Ohio-3533, ¶ 23, quoting *State v. Wilson*, 9th Dist. Summit No. 26683, 2014-Ohio-376, ¶ 31. This Court, therefore, cannot conclude that the jury clearly lost its way in convicting Mr. Fields of aggravated burglary.

**Kidnapping**

{¶28} Mr. Fields argues that his kidnapping convictions were against the manifest weight of the evidence as there was no evidence that he forcibly removed or restrained the victims. He further maintains that any restraint was not committed for the purpose of facilitating a felony offense.

{¶29} Mr. Fields was charged with kidnapping under alternate theories pursuant to Revised Code Section 2905.01(A)(2) and (B)(2). In this assignment of error, he challenges the convictions under Section 2905.01(A)(2). This section provides that "[n]o person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person * * * [t]o facilitate the commission of any felony or flight thereafter[.]"

{¶30} None of the victims testified that Mr. Fields forced them upstairs to the bedroom or told them they could not leave the bedroom. All of them, however, reported that they did not believe they could safely leave the bedroom once they were there. All of the witnesses stated that Mr. Fields referred to the matter as a "hostage situation." Tracey testified that, even after Mr. Fields went back downstairs, she did not feel she could leave because he would be able to see her and get to her before she could flee. Shelli testified that she also did not feel she could

leave because he was "too strong," and did not give them an opportunity to leave when he paced around the room and "taunt[ed]" them. She reported that her sisters wanted her to jump out of an upstairs window to go get help, but that she was too scared to do so because she thought Mr. Fields would catch her and harm the other victims in response to such an attempt. Wanda testified that she felt as if they could not leave the room because she knew that he would harm them. All the victims also testified that Mr. Fields told them they were going to make money for him by performing sexual acts on men that he summoned to the home.

{¶31} The testimony at trial also revealed that Mr. Fields struck several of the victims, including small children, while they were confined to the bedroom. According to Shelli, Mr. Fields punched her in the head three or four times. He hit the two-month-old infant with his forearm the first time he hit Shelli. Tracey reported that, when Mr. Fields swung his arm at her from across the bed, he ended up slapping her eight-year-old son in the face. All of the victims testified that Mr. Fields threatened to shoot them and called someone to bring him a gun and a number of bullets which matched the number of women and children in the room.

{¶32} Tracey, Shelli, and Wanda reported that they could hear glass breaking and items being thrown around once Mr. Fields went back downstairs. Officer Gonzalez testified that two other officers who attempted to enter the front door of the residence reported that it appeared barricaded by items shoved up against the door. He could hear women and children crying and screaming for help as he arrived on the scene.

{¶33} While there was no evidence that Mr. Fields physically moved any of the victims or specifically told them they could not leave, the jury could have reasonably found that he restrained their liberty. The testimony suggested that, once the victims were in the upstairs bedroom, it became a "hostage situation" in which they were not free to leave. Further, Officer

Gonzalez's testimony suggested that Mr. Fields had barricaded the front door preventing them from leaving even if they left the bedroom.

{¶34} Regarding Mr. Field's assertion that there was no evidence that the restraint was done for the purpose of facilitating a felony offense, both Tracey and Shelli testified that he took not only cell phones, but also debit cards and elicited personal identification numbers. Their testimony demonstrated that he made them lift up their clothing to make sure they had not hidden any items from him. In addition, the fact that he called men over to the house to have sex with the victims so that he could make money suggests that he restrained the victims for the purposes of taking their personal property rather than an incidental consequence of his argument with Tracey. This Court, therefore, concludes that Mr. Fields' kidnapping conviction was not against the manifest weight of the evidence.

{¶35} Based on the foregoing, this Court sustains Mr. Fields' assignment of error only as it pertains to his aggravated robbery conviction. His remaining arguments concerning his aggravated burglary and kidnapping convictions are overruled.

ASSIGNMENT OF ERROR II

THE VERDICTS FOR KIDNAPPING IN COUNTS SEVEN THROUGH FOURTEEN WERE AGAINST THE WEIGHT OF THE EVIDENCE.

{¶36} In his second assignment of error, Mr. Fields argues that his convictions for kidnapping under Revised Code Section 2905.01(B)(2) were against the manifest weight of the evidence.[2] While he acknowledges that he assaulted the victims, he maintains that he did not create a substantial risk of physical harm.

---

[2] Mr. Fields includes count seven in both his first and second assignments of error. The specific conviction in count seven was for kidnapping in violation of Revised Code Section 2905.01(A)(2), which is addressed in his first assignment of error. Accordingly, this Court

**{¶37}** Mr. Fields was convicted of kidnapping in violation of Section 2905.01(B)(2). This statute provides that

> [n]o person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall knowingly do any of the following, under circumstances that create a substantial risk of serious physical harm to the victim or, in the case of a minor victim, under circumstances that either create a substantial risk of serious physical harm to the victim or cause physical harm to the victim: * * * Restrain another of the other person's liberty.

A "[s]ubstantial risk" is defined as "a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist." R.C. 2901.01(A)(8). "Serious physical harm" to a person is defined as any of the following:

> (a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment; (b) Any physical harm that carries a substantial risk of death; (c) Any physical harm that involves some permanent incapacity * * * or that involves some temporary, substantial incapacity; (d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement; (e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

R.C. 2901.01(A)(5).

**{¶38}** Tracey testified that she sought treatment at the emergency room the next day for an injury to her ear. Medical records that were submitted as exhibits demonstrated that she actually sought treatment four days after the incident and was diagnosed with a perforated eardrum. The records reflected that Tracey required follow up treatment with a specialist after the diagnosis. It is unclear from the record whether she sustained the injury during the initial altercation with Mr. Fields downstairs or in the upstairs bedroom. Tracey further testified that she did not immediately seek medical treatment because she knew that Mr. Fields was admitted to the hospital.

---

confines its analysis in this assignment of error to the kidnapping convictions pursuant to Section 2905.01(B)(2) in counts eight through fourteen.

{¶39} Shelli testified that she sought medical treatment two days later for a headache. Medical records submitted into evidence demonstrate that a CT scan of her brain did not reveal any abnormalities. She was discharged with pain medication. Shelli testified that she had bruising and knots on her head as a result of Mr. Fields punching her. She described the blows as "very strong" and that she "thought [her] neck was going to break the way he was just punching [her] on the top of [her] head so hard."

{¶40} Finally, the victims testified that Mr. Fields told the responding officers that they would need to shoot their way into the room and blocked their access by holding the door closed. Officer Gonzalez testified that he had his duty weapon out of its holster when Mr. Fields repeatedly stated, "Just shoot it, shoot it, go ahead and shoot." He further testified that he then holstered his gun and exchanged it for his taser which he fired into the bedroom at Mr. Fields once he was able to slide his hand in the door. Officer Gonzalez reported that, after he entered the room, he observed one barb from the taser in Mr. Fields' left palm. The other barb ricocheted off of Mr. Fields' hand and lodged in the ceiling.

{¶41} After a careful review of the record, we are not persuaded by Mr. Fields' argument that the jury lost its way in convicting him of kidnapping under Revised Code Section 2905.01(B)(2). Mr. Fields' admittedly assaulted the victims causing them to seek medical treatment. Further, his actions in attempting to provoke the police into firing into the room and deploying a taser placed the victims at a substantial risk of serious physical harm. We, therefore, overrule his second assignment of error.

ASSIGNMENT OF ERROR III

THE MULTIPLE-COUNT PROVISION OF R.C. 2941.25 WAS VIOLATED
WHEN THE TRIAL COURT RAN THE SENTENCES CONSECUTIVELY TO
ONE ANOTHER.

{¶42} In his third assignment of error, Mr. Fields argues that all of his kidnapping offenses were allied offenses of similar import because they were committed with a single animus directed toward Tracey. He maintains that, since all the offenses should have merged, the trial court plainly erred in imposing consecutive sentences. We disagree.

{¶43} Appellate review of a trial court's determination on allied offenses of similar import is de novo. *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, ¶ 1. Revised Code Section 2941.25(A) states that "[w]here the same conduct by [a] defendant can be construed to constitute two or more allied offenses of similar import, * * * the defendant may be convicted of only one." If, however, "the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, * * * the defendant may be convicted of all of them." R.C. 2941.25(B). "[S]ame conduct" is defined as "a single act, committed with a single state of mind." *State v. Johnson*, 128 Ohio St. 3d 153, 2010-Ohio-6314, ¶ 49, quoting *State v. Brown*, 119 Ohio St.3d 447, 2008-Ohio-4569, ¶ 50 (Lanzinger, J., concurring in judgment only).

{¶44} "Multiple convictions are proper when a single act is committed against multiple victims and that act constitutes an offense which is defined in terms of conduct toward another." *State v. Clayton*, 9th Dist. Summit No. 26910, 2014-Ohio-2165, ¶ 30, citing *State v. Jones*, 18 Ohio St.3d 116, 117-118 (1985). In such a case, the act constitutes two offenses of dissimilar import. *Id.*, citing *Jones* at 118. "[W]here a defendant commits the same offense against

different victims during the same course of conduct, a separate animus exists for each victim such that the offenses are not allied, and the defendant can properly be convicted of and sentenced on multiple counts." *Id*., quoting *State v. Chaney*, 8th Dist. Cuyahoga No. 97872, 2012-Ohio-4934, ¶ 26.

**{¶45}** Mr. Fields was convicted of seven counts of kidnapping under Section 2905.01(B)(2), one for each victim. He was also convicted of five counts of kidnapping under Section 2905.01(A)(2), each concerning a different victim. The trial court merged the Section 2905.01(A)(2) offenses with the Section 2905.01(B)(2) offenses prior to imposing sentence. Because the kidnapping statute defines the offense in terms of conduct toward "another" a separate animus existed for each victim. *See* R.C. 2905.01(A); *Clayton* at ¶ 31; *State v. Kwambana*, 12th Dist. Clermont No. CA2013-Ohio-092, 2014-Ohio-2582, ¶ 14. Accordingly, his kidnapping offenses under Section 2905.01(B)(2) are of dissimilar import, and would not merge under Section 2941.25. *State v. Washington*, 137 Ohio St.3d 427, 2013-Ohio-4982, at ¶12. Mr. Fields' third assignment of error is overruled.

ASSIGNMENT OF ERROR IV

> THE TRIAL COURT IMPOSED A CRUEL AND UNUSUAL PUNISHMENT IN VIOLATION OF THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION BY SENTENCING FIELDS TO A PRISON TERM OF THIRTY YEARS.

**{¶46}** Mr. Fields argues in his fourth assignment of error that his aggregate sentence of 30 years in prison was disproportionate to his crimes and constituted cruel and unusual punishment in violation of the United States and Ohio constitutions. Specifically, he contends that his sentence was disproportionate because he did not use a weapon, the victims did not suffer any serious physical injury, and that the sentence for other more serious crimes, such as murder, is less than what he would have received in this case. We disagree.

{¶47} Review of the proportionality of sentences focuses on the individual sentences rather than their aggregate effect when they are imposed consecutively. *State v. Hairston*, 118 Ohio St.3d 289, 2008-Ohio-2338, ¶ 20. The Ohio Supreme Court has held that "[w]here none of the individual sentences imposed on an offender are grossly disproportionate to their respective offenses, an aggregate prison term resulting from consecutive imposition of those sentences does not constitute cruel and unusual punishment." *Id*. at the syllabus. The *Hairston* court concluded that an aggregate prison term of 134 years for convictions of four counts of aggravated robbery, four counts of kidnapping, and three counts of aggravated burglary, all with firearm specifications, did not amount to cruel and unusual punishment "[b]ecause the individual sentences imposed by the [trial] court are within the range of penalties authorized by the legislature, they are not grossly disproportionate or shocking to a reasonable person or to the community's sense of justice and do not constitute cruel and usual punishment." *Id*. at ¶ 23.

{¶48} After merging many of Mr. Fields' convictions, the trial court sentenced him to the following prison terms: (1) seven years for kidnapping Wanda; (2) five years for kidnapping Shelli; (3) five years for kidnapping Tracey; (4) three years for kidnapping the infant, J.K.; (5) three years for kidnapping the four-year-old, M.N.; (6) three years for kidnapping the six-year-old, A.K.; (7) three years for kidnapping the eight-year old, O.K.; and (8) 12 months for assaulting Officer Gonzalez. All of the kidnapping offenses were first-degree felonies while the assault offense was a fourth-degree felony.

{¶49} Under Section 2929.14(A)(1), Mr. Fields could have received a maximum sentence of 11 years for each kidnapping count. He received the maximum sentence of 12 months for the assault on Officer Gonzalez. R.C. 2929.14(A)(5). Each individual sentence is, therefore, with the statutory range of penalties that the trial court could have imposed. Further,

given the facts of this case, the sentences were not grossly disproportionate or shocking to a sense of justice and, therefore, do not constitute cruel and unusual punishment. Accordingly, this Court concludes that Mr. Fields' aggregate prison sentence of 30 years does not constitute "cruel and unusual punishment[ ]" in violation of either the Eighth Amendment to the United States Constitution or Section 9, Article I of the Ohio Constitution. His fourth assignment of error is overruled.

## III.

{¶50} Mr. Fields' first assignment of error is sustained in part insofar as there was insufficient evidence to support his conviction for aggravated robbery. Mr. Fields' remaining assignments of error are overruled. The judgment of the Lorain County Court of Common Pleas is affirmed in part, reversed in part, and the cause is remanded for the trial court to vacate his conviction for aggravated robbery.

Judgment affirmed in part,
reversed in part,
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is

instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed equally to both parties.

JENNIFER HENSAL
FOR THE COURT

BELFANCE, P. J.
CARR, J.
CONCUR.

APPEARANCES:

KENNETH N. ORTNER, Attorney at Law, for Appellant.

DENNIS P. WILL, Prosecuting Attorney, and NATASHA RUIZ GUERRIERI, Assistant Prosecuting Attorney, for Appellee.